## TURNER v. THE STATE.

1. Where a defendant on trial for murder introduced testimony tending to show that the witness on whom the State mainly relied to establish his guilt could not have seen the shooting as related by her, it was error to charge: "It is contended by the defendant that the only evidence or the only source of information that the jury can rely upon to find a verdict in this case is from his voluntary statement." The charge was especially hurtful when the court allowed illegal testimony tending to discredit the defendant's statement, although in a minor particular.

2. Although a defendant may in his statement assign as the cause of his presence at the place of the homicide that he had information that the deceased had interfered with his labor, and that he went to a tenant-house on his plantation where the homicide occurred, for the purpose of commanding the deceased to leave his premises, it was error to allow the State to prove by a witness that he had been a near neighbor of the deceased for twenty years, and had never heard of his having a reputation for interfering with the hands of other people.

3. "Where an effort is made to impeach a witness by proving contradictory statements made in a conversation which occurred previously to the trial, it is competent to sustain the witness by bringing out the whole of that conversation, in order that the true drift and meaning of what was then said by him may be correctly understood."

4. The evidence did not authorize a charge on the subject of manslaughter.

5. The other assignments of error, relating to alleged errors in charging and refusing to charge, are without merit. As a new trial is ordered, it is unnecessary to consider the assignments of error as to the alleged conduct and partiality of one of the jurors.

Argued November 16, 1908.—Decided January 12, 1909.

Indictment for murder. Before Judge Spence. Calhoun superior court. September 25, 1908.

J. J. Beck, H. M. Calhoun, W. D. Sheffield, J. H. Hall, Emmett Barnes, and Warren Roberts, for plaintiff in error.

John C. Hart, attorney-general, William E. Wooten, solicitor-general, and M. J. Yeomans, contra.

EVANS, P. J. A. W. Turner, junior, was convicted of the murder of Jim Casey, and the jury in their verdict recommended him to mercy. He moved for a new trial, which was refused, and he brings error.

1-2. The only eye-witness to the homicide was the widow of the deceased. She testified that she was standing in the room of a house, and, looking through an open window, saw the defendant as he fired upon her husband. According to her testimony, the

killing was an unprovoked murder. The defendant in his state-
ment denied that the killing occurred as narrated by this witness,
and contended that he shot the deceased in self-defense. He also
introduced testimony to the effect that at the time of the shooting
the shutter to the window through which the State's witness
claimed to have looked was closed. The court in presenting the
defendant's contentions instructed the jury as follows: "It is
contended by the defendant that the only evidence, or the only
source of information, that the jury can rely upon to find a ver-
dict in this case is from his voluntary statement." It is com-
plained that this was an improper and unfair presentation of the
defendant's contention, and placed him in the attitude of insisting
that his sole reliance for an acquittal was upon his voluntary state-
ment. The burden was on the State to establish the defendant's
guilt beyond a reasonable doubt. The only testimony relating to
the actual killing was delivered by the widow of the deceased, who
testified that she observed the killing through an open window.
The defendant offered testimony tending to show that she could
not have seen the tragedy, because at the time of the killing the
window was closed by a shutter. By this testimony the defendant
squarely challenged the credibility of the witness upon whom the
prosecution mainly relied for a conviction; and it was his right to
have the jury, independently of his own statement, to pass upon
the sufficiency and credibility of the evidence produced to estab-
lish the corpus delicti. The language used by the court in form-
ulating the defendant's contention was unfortunate, and calcu-
lated to disparage his evidence by unduly impressing upon the
jury that his sole reliance for a favorable verdict was upon his
voluntary statement. This instruction was peculiarly harmful
when considered in connection with another assignment of error
on the admission of certain testimony. The defendant in his
statement asserted that he had information that the deceased had
prevented certain persons, whom he had hired, from moving on his
plantation. This was advanced as a reason why he went to the
house of one of his tenants (where the homicide occurred) for the
purpose of ordering the deceased off his plantation. The court,
over objection, allowed a witness to testify: "I have known Jim
Casey twenty-five or thirty years. He has lived all the time where
he lived at the time of his death. I have been living within a

mile of him for twenty years. I do not know his reputation for interfering with other people's hands. I have never heard of his having such a reputation in the community." This testimony is not altogether negative. When a near neighbor says of a man that he has lived close by him for twenty years and never heard of his reputation as to possessing a bad or.objectionable trait of character, it is equivalent to affirming that the man has no such reputation. If he had, surely a near neighbor would have heard of it within such a long period of time. This testimony was inadmissible. The reputation of the deceased in the community that he did not interfere with the contracts of labor of other persons in no way illustrated the issue in the case on trial. Although the defendant in his statement did say that he had heard that the deceased had interfered with his labor, he did not claim that as a justification of the shooting. When the court allowed this testimony, its tendency was to cast a shadow of suspicion on the defendant's statement. The charge to which we have just adverted, when applied to this testimony, was especially prejudicial, in that the jury were instructed that the defendant contended that he alone had given a truthful account of the tragedy in his voluntary statement, and illegal testimony had been allowed to discredit that statement in a certain particular.

3. The defense offered a witness, Doctor Thomas, who testified that Esther Casey, the widow of the deceased, said in the presence of himself, Mr. Jordan, and others, a few hours after the homicide, that she did not see the gun fire and her husband fall; that there was a closed shutter which cut off her view. This testimony was offered to impeach the witness Esther Casey. In reply to this attack on the witness the State offered Mr. Jordan, and he was permitted to testify, over objection, as to his recollection of the conversation to which Doctor Thomas referred, as follows: "I think about the first word she said was, "Vinie Floyd kinder throwed herself in the window and said, 'Mr. Turner, don't do that,'— throwed herself in the window and said 'Oh Lord, Mr. Turner, don't do that!' and he shot the second time, and when he did she says, 'Has he shot my husband?' and I don't remember the answers she said right at that time that Vinie Floyd made to her. I believe she said, 'Oh, I am so sorry!' then she replied, 'Has .he shot my husband?' and she says, 'am so sorry Mr. Casey fell.'" This

testimony was admissible. We recognize the general rule that a witness whose credibility has been attacked by proof of previous contradictory statements can not be sustained by proof that the witness may have made other statements consonant with his testimony as delivered at the trial. The effort was not to prove a different statement, but to sustain the witness by showing what was said by her in the same conversation to which the impeaching witness referred. It will be observed that the impeaching witness did not undertake to relate the exact words of the witness attacked, but only to give the substance of the conversation. "The rule is settled," says Lumpkin, J., in *Lowe* v. *State,* 97 *Ga.* 792 (25 S. E. 676), "that where an effort is made to impeach a witness by proving contradictory statements made in a conversation which occurred previously to the trial, it is competent to sustain the witness by bringing out the whole of that conversation, in order that the true drift and meaning of what was then said by him may be correctly understood."

4. Complaint is made that the court should have instructed the jury on the law of voluntary and involuntary manslaughter. We have critically examined the evidence, and find no basis for an instruction on the lesser grades of homicide. Acording to the evidence submitted by the State, the defendant became angered because the deceased had stopped to visit one of his tenants, and ordered him off his plantation, and while the deceased was obeying the command he was shot and killed by the defendant. There was no written request by the defendant to instruct the jury on the law of manslaughter. Under this assignment of error we are not called upon to determine whether the statement of the prisoner, considered of itself, presented this phase of homicide. The rule is settled by many adjudications that, in the absence of a written request, the court is not required to charge a theory presented solely by the prisoner's statement. *Robinson* v. *State,* 114 *Ga.* 56 (39 S. E. 862).

5. Other portions of the charge of the court were criticised, but when considered in connection with their context in the charge no error is made to appear. The request to charge, so far as legal and pertinent, was covered in the general charge. As there will be another trial it is unnecessary to consider the assignments relating to the conduct of one of the jurors.

*Judgment reversed. All the Justices concur, except Fish, C. J., absent.*